NOT DESIGNATED FOR PUBLICATION

No. 127,355

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee,*

v.

BRIAN DALE WILSON,
*Appellant.*


MEMORANDUM OPINION

Appeal from Reno District Court; KEITH SCHROEDER, judge. Submitted without oral argument. Opinion filed August 1, 2025. Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Kimberly A. Rodebaugh*, senior assistant district attorney, *Thomas R. Stanton*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.


Before WARNER, C.J., ARNOLD-BURGER and BRUNS, JJ.


PER CURIAM: Brian Dale Wilson appeals his convictions for possession of methamphetamine and possession of drug paraphernalia with intent to use. Law enforcement officers conducted a welfare check on Wilson after someone called 911 to report a man walking in and out of traffic on a Saturday night. When officers approached Wilson, he handed over two cigarette packs—one of which contained a small baggie of methamphetamine. After his arrest, officers also found a syringe in his front pocket. Although Wilson presents three issues on appeal, we find no reversible error based on our review of the record. Thus, we affirm Wilson's convictions.

1

On June 11, 2022, Our Lady of Guadalupe Catholic Church was holding a festival in South Hutchinson. Shortly before 10 p.m., someone attending the festival called 911 to express their concern about a man who was walking in and out of traffic. Sergeant Jayson Gaines of the South Hutchinson Police Department was asked to check on the man's welfare. Shortly before Sergeant Gaines arrived at the scene, dispatch received a second call, but no one spoke. Dispatch was subsequently able to associate the phone number with Wilson.

Sergeant Gaines saw a man meeting the description given to dispatch by the first caller standing in the yard of a nearby residence. The man—who was later identified as Wilson—tried to give the officer two packets of cigarettes, a cell phone, and a sock. In response, Sergeant Gaines told Wilson to lay the items on the ground, and he complied. The officer observed Wilson to be "moving around a lot, pacing back and forth in the yard, [and] sweating profusely." He explained that Wilson "looked like he was confused" and noted that his speech pattern was "rapid and kind of all over the place."

Soon after, Officer John Brislin arrived at the scene. When Officer Brislin arrived, Wilson started talking to him. As Wilson was talking, he tried to hand Officer Brislin the cigarette packs. During this interaction, Officer Brislin noted that Wilson's demeanor included "[s]ome excitability, lots of talking, very fidgety, just animated maybe is another way to describe it."

A third law enforcement officer, Officer Lance Hirt, also arrived at the scene. He noticed that Wilson was "very animated, very excited, [and] seemed really worked up at that point." Officer Hirt described several things he noted about Wilson's behavior that were consistent with someone under the influence of controlled substances. In particular, Officer Hirt indicated that Wilson "was having difficulty communicating with the officers

when they were asking him questions and talking to him about why they were there. He was very animated, seemed very agitated, very upset."

At the scene, Officer Brislin examined the cigarette packs that Wilson had given to the officers. In one of the packs, he found a small baggie with a crystal substance and showed it to Sergeant Gaines. Both officers believed—based on their training and experience—that the substance in the baggie was methamphetamine. When asked about the cigarette pack in which the baggie was found, Wilson told the officers that he had taken the pack of cigarettes from a woman, with the intention of giving it to police. He also briefly mentioned that he had called 911.

After the officers placed Wilson under arrest, he became angry and a "little more aggressive." Upon arrival at the Reno County Correctional Facility, Wilson yelled profanities at officers in the booking area. During the booking process, a needleless syringe was found in Wilson's right front cargo pocket of the shorts he was wearing. Officer Brislin looked at the syringe and believed that it had residue inside.

Wilson was then transported to the local hospital for examination. According to Officer Brislin, Wilson "became very excited" and "yelled profanities" on the drive to the hospital. Even though Wilson initially calmed down when he arrived at the hospital, he once again became "extremely excited, using profanities, yelling at officers, yelling at staff, and he had to be restrained" so that the medical staff could examine him. Wilson also tried to break out of the handcuffs he was wearing, and the medical staff had to administer medication to help "calm him down."

Sergeant Gaines stayed with Wilson for a few hours at the hospital until he was discharged. While being transported to the correctional facility, Wilson was yet again agitated and yelling. Upon arrival at the facility, Wilson refused to get out of the patrol vehicle, so Sergeant Gaines pulled him out by the legs and escorted him into the jail.

3

The State charged Wilson with one count of possession of methamphetamine and one count of possession of drug paraphernalia with intent to use. During a two-day jury trial, the State presented the testimony of four witnesses—including the three officers involved in the arrest and one employee of the Kansas Bureau of Investigation—and introduced six exhibits that were admitted into evidence. In his defense, Wilson presented the testimony of one witness, a city dispatch employee.

At trial, Sergeant Gaines testified regarding his training and experience with individuals who had used methamphetamine and were under the influence of controlled substances. He explained: "So usually they're sweating profusely. They talk at a rapid pace and then stop talking and continue talking at a rapid pace. Their eyes move around a lot. They can't stand still. They fidget with their arms or continuously pace back and forth spinning in circles, things like that." Sergeant Gaines further testified that he observed similar behaviors when he was talking to Wilson on the night of his arrest.

Specifically, Sergeant Gaines testified:

"[Wilson's] story was inconsistent. He was yelling or talking loudly and then talking quietly and then talking loudly again at a fast pace. He was moving around a lot as in his hands and feet. When he was standing he was kind of rocking back and forth moving his hands a lot."

During the State's presentation of evidence, the jury was shown a video obtained from the body camera footage taken during his interaction with the police on the night of his arrest. The video confirms the testimony of the officers regarding Wilson's demeanor and behavior. The footage showed that Wilson attempted to hand over the items to law enforcement officers, including the cigarette pack containing the baggie of methamphetamine. In addition, Wilson made references to taking "stuff" out of "her" purse so that he could call the police.

4

Wilson also referred to a woman that blocked his phone by copying or cloning her phone, and he also claimed he was drugged illegally. He stated that the woman would not let him leave, and she claimed that he stole her wallet. When the officer asked Wilson to allow him to see his phone to see if he called 911 as he claimed, he responded: "Can you not understand that she copied my phone?" and later said, "It's called cloning or whatever it is, I don't know how to do that." The video also showed that when the officer asked Wilson if he had anything else in his pockets that they should know about, he responded: "Not that I know of."

A Kansas Bureau of Investigation forensic scientist who had tested the crystal substance in the baggie seized from Wilson testified that it was positive for methamphetamine. However, she also testified that the syringe plunger found in Wilson's pocket on the night of his arrest tested negative for controlled substances. Moreover, the city dispatch employee called by Wilson testified regarding the call she received at 9:51 p.m. expressing concern about a man walking in and out of traffic. She also testified about a subsequent call in which no one spoke. According to the dispatcher, the second call was placed from a phone number associated with Wilson.

After weighing the evidence, the jury convicted Wilson on both charges. Although the district court sentenced Wilson to a controlling 30-month prison sentence, it suspended the sentence and placed him on probation for a term of 18 months. Thereafter, Wilson filed a timely notice of appeal.

ANALYSIS

*"Innocent Possession" Defense*

For the first time on appeal, Wilson contends that the district court should have instructed the jury sua sponte that one must intentionally appropriate a drug to themselves

5

in order to be found guilty of possession. Wilson's argument is based on his assertion that he was in "innocent possession" of the baggie of methamphetamine found in one of the cigarette packs he had in his possession on the night of his arrest. At trial, Wilson claimed that he took the cigarette pack from a woman's purse at the festival with the intention of turning it over to the police. Nevertheless, after considering his defense, the jury found him to be guilty beyond a reasonable doubt of possession of methamphetamine.

Even though Wilson concedes that he did not request an "innocent possession" or an intentional appropriation instruction at trial, he suggests that the district court committed clear error by failing to give such an instruction to the jury based on his theory of defense. When a jury instruction is not requested, we reverse only if the district court's failure to give the instruction was clearly erroneous. To establish clear error, Wilson must show that the jury would have reached a different verdict if the instruction would have been given. K.S.A. 22-3414(3); see *State v. Bentley*, 317 Kan. 222, 242, 526 P.3d 1060 (2023).

When reviewing an assertion that the district court erred in instructing the jury, we first determine whether the instruction was legally and factually appropriate. Our review is unlimited over whether the instruction would have been legally and factually appropriate. *State v. Holley*, 313 Kan. 249, 254, 485 P.3d 614 (2021). If the instruction would have been both legally and factually appropriate, we then assess—based on the entire record—whether the alleged error requires reversal or is harmless. *Bentley*, 317 Kan. at 242; see *State v. Berkstresser*, 316 Kan. 597, 605-06, 520 P.3d 718 (2022).

Here, although the giving of an "innocent possession" defense may have been factually appropriate based on Wilson's theory of defense, we find that it would not have been legally appropriate. This is because Kansas does not recognize "innocent possession" as a justification for possession of contraband. *State v. Calvert*, 27 Kan. App.

2d 390, 392, 5 P.3d 537 (2000); see *State v. Martin*, No. 115,753, 2017 WL 4848583, at *9 (Kan. App. 2017) (unpublished opinion) (citing *Calvert*, 27 Kan. App. 2d 390, Syl. ¶ 1). As a general rule, a private citizen cannot legally possess contraband even if they intend to turn it over to law enforcement. See *State v. Vrabel*, 301 Kan. 797, 803, 347 P.3d 201 (2015) (a confidential informant cannot legally possess contraband to give to police officers unless acting as an agent of law enforcement). Accordingly, we conclude that the district court did not commit clear error by failing to give an "innocent possession" defense in this case.

Furthermore, even if the giving of an "innocent possession" instruction had been both legally and factually appropriate, the failure to give it was harmless. In this case, the jury viewed the body camera footage of Wilson's interaction with the police on the night of his arrest. In doing so, the jurors could observe his demeanor as well as hear his explanation regarding how the methamphetamine allegedly came into his possession. And during closing argument, Wilson's attorney was allowed to argue that Wilson had taken the cigarette pack containing the methamphetamine in order to turn it over to the police.

Likewise, Wilson did not deny having possession of the cigarette pack containing the methamphetamine nor did he assert at trial that an exemption to illegal possession applied. Instead, as confirmed by the bodycam video, he made vague references to taking "stuff" out of "her" purse so that he could call the police. At trial, Sergeant Gaines testified that based on his experience, it is common for suspects to try to hand an item over to officers and claim that the item does not belong to them. He also testified: "More so than not, probably eighty percent of the time they try to shift blame."

Our Supreme Court has explained that a district court does not commit clear error merely because it failed to give an unrequested instruction that would have been legally and factually appropriate. Instead, it is incumbent upon the defendant to show that the

instructions given by the district court were insufficient because they failed to properly state the law or were likely to mislead the jury. See *State v. Dotson*, 319 Kan. 32, 53, 551 P.3d 1272 (2024). In this case, Wilson has failed to show that the jury instructions given by the district court were incomplete, improper, unfair, or likely to mislead the jury. Furthermore, we find that the jury instructions given by the district court regarding the crime of possession adequately informed the jury of the elements that the State was required to prove beyond a reasonable doubt.

Likewise, we are not firmly convinced there is a real possibility that the jury would have rendered a different verdict had an "innocent possession" instruction been given. See K.S.A. 22-3414(3); *Bentley*, 317 Kan. at 242. Viewing the jury instructions given and the evidence introduced at trial as a whole, we find that Wilson has failed to establish clear error. Accordingly, we conclude that reversal of Wilson's conviction for possession of methamphetamine is not warranted.

*Sufficiency of the Evidence*

Next, Wilson contends that insufficient evidence supports his conviction of possession of drug paraphernalia with the intent to use it to ingest or introduce a controlled substance into a human body. When a defendant challenges the sufficiency of the evidence, we review the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. In doing so, we do not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses. *State v. Kemmerly*, 319 Kan. 91, 102, 552 P.3d 1244 (2024).

In proving a defendant's guilt, the State may use both direct and circumstantial evidence, along with any logical inferences properly drawn from the evidence. *State v. Chandler*, 307 Kan. 657, Syl. ¶ 3, 414 P.3d 713 (2018). A conviction of even the gravest

8

offense may be based on circumstantial evidence, and the evidence does not need to exclude every other reasonable conclusion to support a conviction. *State v. Zongker*, 319 Kan. 411, 417, 555 P.3d 698 (2024). The State must present sufficient evidence supporting each element of the crime to meet the sufficiency of the evidence standard. *State v. Hilyard*, 316 Kan. 326, 330, 515 P.3d 267 (2022).

Wilson was convicted of "unlawfully and intentionally, knowingly or recklessly use, possess, or have under the defendant's control with intent to use, drug paraphernalia, to introduce a controlled substance into the human body." See K.S.A. 21-5709(b)(2). At trial, the district court instructed the jury that the State was required to prove beyond a reasonable doubt that Wilson possessed a syringe with the intent of using it as drug paraphernalia to introduce methamphetamine into the human body. Because it is undisputed that Wilson possessed the syringe, the only disputed issue is whether he did so with the intent to use it as drug paraphernalia to introduce drugs into the human body.

It is also undisputed that the syringe did not contain a needle for injection and that the plunger—which was tested by the Kansas Bureau of Investigation—did not contain the residue of controlled substances. But under K.S.A. 2021 Supp. 21-5711(b), it is not a defense that "an item has not yet been used or did not contain a controlled substance at the time of the seizure." In the absence of such evidence, K.S.A. 2021 Supp. 21-5711 requires the State to provide other evidence of the item's intended use. See K.S.A. 2021 Supp. 21-5711(a)(15).

A review of the record on appeal in the light most favorable to the State reveals that the State presented evidence that Wilson was found in possession of 1.06 grams of methamphetamine. At trial, Officer Brislin testified that based on his training and experience, syringes like the one found on Wilson are used to "[i]ngest drugs or used as paraphernalia." Significantly, Officer Brislin also testified that a syringe is commonly used for ingesting methamphetamine.

In addition, Wilson's actions on the night of his arrest—including walking in and out of traffic as well as his erratic behavior—could be viewed by a reasonable person as persuasive evidence that he was under the influence of drugs. Again, it is important to recognize that the jury was not only able to hear the testimony presented at trial but was also able to view the body camera footage from Wilson's encounter with the police. Based on the evidence presented, we find that a reasonable juror could infer that Wilson possessed the syringe with the intent to use it to introduce methamphetamine into his body. So, considering the evidence in a light most favorable to the State, we conclude that the evidence was sufficient for the jury to find Wilson guilty beyond a reasonable doubt of possession of paraphernalia with the intent to use it to inject or introduce methamphetamine.

*Prosecutorial Error*

Finally, Wilson contends that he was deprived of a fair trial because of certain statements made by the prosecutor during closing arguments. In response, the State candidly concedes that the prosecutor made some misstatements during her closing but argues that they were harmless. We apply a two-step process to evaluate claims of prosecutorial error. First, the reviewing court determines whether an error occurred. Second, the court determines whether such error is harmless. *State v. Sieg*, 315 Kan. 526, 535, 509 P.3d 535 (2022). In light of the State's concession that there were erroneous statements made by the prosecutor during closing arguments, we will proceed directly to the second factor.

As such, we must determine whether the erroneous statements made by the prosecutor prejudiced Wilson's right to a fair trial. See *State v. Gallegos*, 313 Kan. 262, 273, 485 P.3d 622 (2021). In making this evaluation, we may find errors to be harmless if the State can demonstrate "'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there

10

is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016); see *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967); *State v. Fraire*, 312 Kan. 786, 791-92, 481 P.3d 129 (2021). In other words, the State must show beyond a reasonable doubt that the errors did not affect the outcome of the trial. *Gallegos*, 313 Kan. at 273.

A prosecutor's misstatement of fact does not warrant reversal if the comment was brief in the context of the entire record and the misstated fact is insignificant in the State's case theory. *State v. Corbett*, 281 Kan. 294, 312, 130 P.3d 1179 (2006). The challenged comments should be viewed in context of the prosecutor's entire argument rather than in isolation. *State v. Pribble*, 304 Kan. 824, 833-34, 375 P.3d 966 (2016). Here, we find that the erroneous comments were brief and did not directly relate to the elements of the charges of possession of methamphetamine and possession of drug paraphernalia.

Moreover, in reviewing the prosecutor's statements in light of the entire record, we do not find that they affected the jury's verdict. This is particularly true because the jury had the opportunity to view Wilson's actions and listen to his statements on the body camera footage taken during his interaction with the police on the night of his arrest. During closing argument, the prosecutor properly directed the jury to the evidence supporting each element of the charges.

In addition, the district court instructed the jury that "[s]tatements, arguments and remarks of counsel are intended to help you in understanding the evidence and in applying the law, but they are not evidence. If any statements are made that are not supported by evidence, they should be disregarded." The district court also instructed the jury that it had the role of determining "the weight and credit to be given the testimony of each witness," and it could "use common knowledge and experience" regarding the matters about which the witnesses had testified. Absent a showing to the contrary, juries

11

are presumed to have followed the instructions given by the district court. *State v. Brown*, 316 Kan. 154, 170, 513 P.3d 1207 (2022).

Significantly, the jury heard Wilson admit to possessing the cigarette pack containing the baggie of a crystal substance when he handed it to Officer Brislin. The jurors also heard Wilson tell the officer that he took the "stuff" out of a woman's purse so that he could call the police. In addition, it is undisputed that the officers found a syringe in Wilson's pants pocket at the law enforcement center. And Officer Brislin testified that a syringe is commonly used to aid in ingesting methamphetamine.

The erroneous statements made by the prosecutor during closing arguments related to Wilson's interaction with the police that was seen and heard by the jury when watching the body camera footage. In addition, the district court allowed Wilson's attorney to argue that his client possessed the methamphetamine for the limited purpose of turning it over to law enforcement. So, not only did the jury view his statements on the body cam video, but defense counsel argued his theory of defense during closing argument.

Given the totality of the evidence admitted at trial, we find that the prosecutor's misstatements did not affect the outcome of the trial in light of the entire record. Likewise, we find nothing in the record on appeal to suggest that the jury would have reached a different verdict had the prosecutor more accurately stated the evidence in closing argument. As such, we conclude that Wilson received a fair trial and that there is no reasonable probability that the prosecutor's misstatements contributed to the verdict.

Affirmed.